## CIRCUIT COURT OF FAIRFAX COUNTY

Teresa A. Kaminsky

v.

Robert H. Kaminsky

November 13, 2002

Case No. (Chancery) 153463

BY JUDGE STANLEY P. KLEIN

This matter is before the court on Plaintiff Teresa Anne Kaminsky (Mother)'s Verified Petition for Rule to Show Cause, the Rule to Show Cause entered by Judge Leslie Alden on April 16, 2002, and the cross-petitions of Defendant Robert Howard Kaminsky (Father) and Mother for a reduction or increase in the child support to be paid by Father to Mother for their minor son, Daniel. The arguments raised by the parties require this court to analyze (1) the enforceability of child support provisions in marital agreements in light of the recent *en banc* decision of the Court of Appeals of Virginia in *Shoup v. Shoup*, 37 Va. App. 240, 556 S.E.2d 783 (2001) (*en banc*), and the subsequent decision of the Supreme Court of Virginia in *Riggins v. O'Brien*, 263 Va. 444, 559 S.E.2d 673 (2002); and (2) the scope and breadth of the Supreme Court's decision in *Antonelli v. Antonelli*, 242 Va. 152, 409 S.E.2d 117 (1991), wherein the Supreme Court imputed income for child support purposes to a payor parent who made a good-faith change in his employment.

## I. *Background*

On November 26, 1997, the Kaminskys entered into a Separation and Property Settlement Agreement (PSA) drafted by William J. Lyden, counsel for Mother. At that time, the parties had two minor children, Natalie Jean Kaminsky and Daniel Nathan Kaminsky. In paragraph 5(a) of the PSA, the parties agreed that Father would pay Mother the sum of $813.59 per month as child support, which was calculated pursuant to Virginia Code § 20-108.2. In addition, the parties included, *inter alia*, the following terms in paragraphs 5(b) and 5(c) of the PSA.

> *Paragraph 5(b)*. In January of each year, beginning in 1998, the Parties agree that they shall exchange gross income data including, but not limited to, all W-2 forms received by the Parties, in order to adjust the child support payments for the forthcoming year so that said payments remain in conformity with Virginia Code Section 20-108.2....
>
> *Paragraph 5(c)*. Upon emancipation of each child at age 18 or the graduation from high school, whichever event occurs last, reductions in child support shall occur immediately and shall follow the guidelines issued by the Commonwealth of Virginia, Guidelines for Child Support, Virginia Code Sec. 20-108.2.

The PSA was incorporated into the parties' Final Decree of Divorce, which was entered by the court on March 24, 1998.

In February 2000, Father resigned his position at Computer Science Corporation (SCI). He testified at the hearing on the instant petitions that between 1998 and the time of his resignation from SCI, sixteen of the thirty-two members of his employment team had either resigned or were terminated. According to Father, the majority of the remaining employees, including his supervisor, were looking for other jobs when Father left SCI in February 2000.

Father also testified that in February 2000, he was forced to leave the residence he was renting because of foreclosure proceedings. He claimed there were no employment opportunities for him in the D.C. metropolitan area and, as a result, he looked into employment possibilities in various areas, including Rochester, New York, where his fiancée lived. A headhunter obtained an interview for Father with Kodak at its headquarters in Rochester, New York, and Father moved to upstate New York without first obtaining new employment. In fact, Kodak had already begun to downsize and he was never offered any employment with that corporation.

From March 2000 until October 2000, Father worked for his fiancée's brother's lawn service business, earning $500.00 per week. In October 2000, he became unemployed and thereafter received weekly unemployment benefits of $344.25 from the State of New York until May 2001, when he obtained his present employment with the Association for Retarded Persons in Rochester. He earns $905.00 bi-weekly through that employment. The parties stipulated that Mother earned between $2,999.00 and $3,495.00 per month during the relevant time frames.

Father testified that, in January of each year commencing January 1998, the parties exchanged information concerning their incomes. Nonetheless, he continued to pay support at the same initial $813.59 per month level until July 2000, when he claims that the parties agreed to a reduction to $500.00 per month based upon their eighteen-year-old daughter Natalie's graduation from high school. Father paid Mother $500.00 per month from July 2000 through March 2001, when his payments became inconsistent. Father contends that he simply does not have the financial ability to make higher monthly support payments. Mother testified at the hearing that, although the parties exchanged financial information at least once after execution of the PSA, they never reached an agreement as to an appropriate modified level of support. She explained that she had not sought relief from the court before the filing of the pending petitions because she did not have the financial ability to retain counsel.

Father argues (1) that pursuant to the *en banc* decision in *Shoup*, the Final Decree incorporating the PSA effected a change in the court ordered child support in July 2000, when Natalie graduated from high school and in January of each subsequent year; and (2) that the court should not impute income to him based upon the circumstances surrounding his voluntary resignation from SCI in February 2000, but, if the court disagrees, income should no longer be imputed to him based upon his good faith efforts to obtain suitable employment during the ensuing two plus years. Mother responds (1) that the Supreme Court decision in *Riggins* precludes any "retroactive" reduction in the level of child support previously ordered as no decree has yet been entered modifying the court-ordered monthly sum; and (2) that the Supreme Court decision in *Antonelli* mandates that this court continue to impute income to Father.

## II. *Analysis*

It has long been settled in Virginia that a court is without authority to retroactively modify past due installments of child or spousal support. *Cofer v.*

*Cofer*, 205 Va. 834, 838-39, 140 S.E.2d 663, 666-67 (1965); *Richardson v. Moore*, 217 Va. 422, 229 S.E.2d 864 (1976); *Alig v. Alig*, 220 Va. 80, 255 S.E.2d 494 (1979); *Commonwealth v. Skeens*, 18 Va. App. 154, 158, 442 S.E.2d 432 (1994); Va. Code § 20-112.

Recently, the Court of Appeals of Virginia in *Shoup v. Shoup*, 37 Va. App. 240, 556 S.E.2d 783 (2001) (*en banc*), and then the Supreme Court of Virginia in *Riggins v. O'Brien*, 263 Va. 444, 559 S.E.2d 673 (2002), addressed the related issue of whether a court may prospectively order a modification of child support based upon future changes in circumstances delineated in an agreement of the parents, which is incorporated in the court's decree. In order to decide the issues in this case, this court must analyze the decisions in *Shoup* and *Riggins*.

In *Shoup*, the parties' agreement provided in relevant part as follows:

> a. [Father] shall pay the amount of $2,177.00 per month, as and for child support, to [mother]. Child support shall continue until *a minor child dies, marries, becomes emancipated, or reaches the age of eighteen years, whichever occurs first,* or until further order of the court....
>
> c. In the event that child care costs decline in a month, the wife *shall* notify the husband *who shall reduce his payment* of childcare costs on the first day of the next month by his proportionate share of such decline....
>
> e. If there is any change in circumstances, the parties *shall follow* the child support guidelines contained in § 20-108.2 of the Code of Virginia or its successor statute and any other relevant Virginia statutes and case law for determination of child support.

(Emphasis added.) The Shoup's agreement was incorporated into their decree of divorce. As the first two of the Shoup's three minor children reached the age of emancipation, the father unilaterally reduced his child support payments by approximately one third on each occasion of emancipation. No court order modifying the original support order was entered. Some years later, the mother sought and obtained a contempt rule based upon the father's failure to pay the full amount of child support initially ordered pursuant to the agreement of the parties.

The trial court ruled that, based upon Virginia's longstanding prohibition against retroactive modifications of support orders, it was required to find that the claimed arrearage existed, and it found the father in contempt. However, it granted the father a credit for the childcare payments he had made during the

period when such expenses were not actually paid by the wife. A panel of the Court of Appeals affirmed the trial court's determination that the provision in the Shoup's agreement providing for modification of the court-ordered child support upon emancipation of each of their children was void and unenforceable. However, the panel reversed the trial court's grant of the childcare credit to the father, holding that this provision of the incorporated agreement was also null and void.

Upon rehearing, the *en banc* Court of Appeals considered all of the relevant Virginia appellate precedent and reversed the panel decision. It reasoned, in part, that once a trial court incorporates the parties' agreement into its decree, "it is enforceable, to the word, as any other term of the decree." *Shoup*, 37 Va. App. at 250, 556 S.E.2d at 788. The *Shoup* Court noted that the authority of a court to adopt the parents' written agreement concerning child support is explicitly set forth in both Va. Code § 20-109.1 and Va. Code § 20-108.1. Further, its own decision in *Watkinson v. Henley*, 13 Va. App. 151, 158, 409 S.E.2d, 470, 474 (1991), requires a trial court to consider the parties' agreement in setting an award of child support. *Shoup*, 37 Va. App. at 250, 556 S.E.2d at 788.

The *en banc* decision in *Shoup* re-affirmed the longstanding public policy of Virginia favoring the amicable resolution of all issues concerning the support of children. *Id.* at 253, 556 S.E.2d at 789-90. *See also Morris v. Morris*, 216 Va. 457, 459, 219 S.E.2d, 864, 867 (1975); *Schmidt v. Schmidt*, 6 Va. App. 501, 503, 370 S.E.2d 311, 312 (1988). The Court of Appeals recognized, however, that Virginia's appellate courts have imposed three limitations on the rights of parties to contract on issues relating to child support. First, a court must review the contract of the parties to assure that it is in the best interests of the children. *Shoup*, at 250, 556 S.E.2d 788 (*citing Watkinson*, 13 Va. App. at 157, 409 S.E.2d at 474; *Fry v. Schwarting*, 4 Va. App. 173, 179, 355 S.E.2d 342, 345 (1987)). Second, the parties may not contractually divest the court of its authority to modify or enforce the terms of its child support decree. *Shoup*, at 250, 556 S.E.2d 788 (*citing Kelly v. Kelly*, 248 Va. 295, 298, 449 S.E.2d 55, 56 (1994); *Featherstone v. Brooks*, 220 Va. 443, 446, 258 S.E.2d 513, 515 (1979); *Morris*, 216 Va. at 461, 219 S.E.2d at 867; *Watkinson*, 13 Va. App. at 157, 409 S.E.2d at 473). Finally, the parties may not terminate the responsibility of a parent to support a child. *Shoup*, at 250-51 (*citing Kelly*, 248 Va. at 298, 449 S.E.2d at 56, and *Church v. Church*, 24 Va. App. 502, 508, 483 S.E.2d 498, 501 (1997)). Finding that none of these limitations was violated by the terms of the Shoup's agreement, the *en banc* Court of Appeals held that "the parties' agreement is fully consistent with Virginia law governing the scope, effect, and validity of such agreements.

Its incorporation into the final decree of divorce necessarily rested on a finding that the provisions were consistent with the best interests of the child." *Shoup*, at 253, 556 S.E.2d at 789-90 (citations omitted). As a result, the case was remanded to the trial court for, *inter alia*, a recalculation of any arrearage based upon the court's determination of the proper level of support due upon the emancipation of each of the parties' children.

In *Riggins v. O'Brien*, 263 Va. 444, 559 S.E.2d 673 (2002), decided approximately two months after the Court of Appeals *en banc* decision in *Shoup*, the Supreme Court of Virginia faced a factual situation strikingly similar to the scenario presented in *Shoup*. Here, the parents had entered into an agreement concerning the support of their four children which was also incorporated in their final decree of divorce. In relevant part, the decree read as follows:

> Adjudged, ordered, and decreed, by agreement of the parties, that the Cross-Plaintiff, Robert John Riggins, as and for the support and maintenance of the parties' minor children, shall pay unto the Plaintiff, Mary Louise Riggins, the sum of Three Thousand Two Hundred Fifty Dollars ($3,250.00) per month on the first day of each month thereafter, commencing on July 1, 1991, and continuing thereafter until said children shall attain the age of eighteen (18) years, marry, become self-supporting, become otherwise emancipated, or die, whichever should first occur ... provided, however, that the amount payable hereunder shall be renegotiated or submitted to a court for adjudication on the first event of emancipation, as set forth above, as to each child....

*Riggins*, 263 Va. at 446, 559 S.E.2d 674. As each of the first two of his children became emancipated,[1] Riggins unilaterally reduced his child support payments by one quarter on each occasion. Although O'Brien did not object to the reductions until two years after the second reduction, no court approval was sought or obtained for either reduction. Eventually, O'Brien caused a rule to show cause to issue why Riggins should not be held in contempt for his failure to make the full monthly support payments required by the decree of divorce. The trial court found that the provision of the divorce decree authorizing renegotiation of the court ordered child support was void *ab initio*

---

[1] The actual emancipation of the parties' second child at the time that Riggins further reduced his support payments was questionable, but this issue was not addressed on appeal.

and it found Riggins in contempt of court for failure to pay the full sum for child support which it had initially ordered. The arrearages, including interest, were determined to exceed $106,000. A panel of the Court of Appeals affirmed, and the Supreme Court awarded Riggins an appeal. As the trial court imposed no sanctions for the contempt, the appeal concerned only the finding of arrearages.

In its opinion, the Supreme Court reaffirmed the principles articulated in its decisions in *Cofer v. Cofer*, 205 Va. 834, 140 S.E.2d 663 (1965) (a court may modify only prospective support payments), and *Kelly v. Kelly*, 248 Va. 295, 298, 449 S.E.2d 55 ("parents cannot contract away their children's rights to support nor can a court be precluded by agreement from exercising its power to decree child support."). *Riggins* at 448, 559 S.E.2d at 675. In *dicta*, the court further stated:

> The responsibility of a divorce court to review child support amounts is necessary to ensure that the child's welfare is adequately addressed and protected given the circumstances of the parents. With the exception of terminating a non-unitary support award upon achieving majority, *specifying future changes in the amount of child support is inappropriate* because it does not allow the divorce court to determine child support based on contemporary circumstances.

*Id.* at 448, 559 S.E.2d 675 (emphasis added). Nonetheless, the Supreme Court rejected the Court of Appeals' ruling that the final decree's support provision was void *ab initio*. It affirmed the trial court solely on the basis that the parties intended in their agreement that a court order would provide the sole mechanism for a modification of child support, either through a consent decree as a result of successful negotiations or an adjudicatory finding of a change in circumstances. *Id.* at 449, 559 S.E.2d 676. The majority opinion made no mention of the Court of Appeals' decision in *Shoup*.

Counsel for Mother asserts that the Supreme Court's decision in *Riggins* is binding on this court and, as no court order has modified the original support provision in the parties' final decree, the court must find that Father has, since the entry of the final decree, been obligated to pay the full original child support figure of $813.59 per month. Father counters that the *en banc* decision in *Shoup* controls, and, as a result, the amount of monthly child support due was reduced in January of each year since 1999, pursuant to paragraph 5(b) of the PSA. He additionally contends that the support was further reduced as of July 1, 2000, pursuant to paragraph 5(c) of the PSA, when the parties' daughter Natalie graduated from high school.

This court agrees with Father that the monthly child support was reduced as of July 1, 2000, pursuant to paragraph 5(c), when Natalie graduated from high school; however, the court finds that the incorporation of paragraph 5(b) did not cause a self-executing modification of the court-ordered child support and that this court is without authority to now retroactively modify the support based upon that provision.

## (A) *The Paragraph 5(c) Issue*

In their PSA, the Kaminskys agreed that, upon emancipation of each of their children, "reductions in child support shall occur immediately and shall follow the guidelines issued by the Commonwealth of Virginia, Guidelines for Child Support, Virginia Code § 20-108.2." That provision became an order of the court when it was incorporated into the parties' final decree of divorce. Mother's argument that this provision is unenforceable in light of the *Riggins* decision is not persuasive. In *Riggins*, the Supreme Court explicitly rejected the Court of Appeals' finding that the parties divorce decree was void *ab initio*. *Id.* at 449, 559 S.E.2d at 676. Although the opinion did state that "specifying future changes in the amount of child support is *inappropriate*," *id.* at 448, 559 S.E.2d at 675 (emphasis added), the Supreme Court did not opine that such a provision was void and unenforceable. Moreover, that portion of the *Riggins* opinion was *obiter dicta* as the holding of the case was based upon the Supreme Court's interpretation of the agreement of the parties, not the enforceability of the contested provision. Although *dicta* may sometimes be persuasive, it is not binding authority in other cases. *Morison v. Dominion Nat. Bank,* 172 Va. 293, 299, 1 S.E.2d 292, 294 (1939); *Virginia Ry. & Power Co. v. Dressler,* 132 Va. 342, 350-51, 111 S.E. 243, 245-46 (1922) ("It is a maxim, not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit, when the very point is involved for decision.") (*quoting* Chief Justice Marshall in *Cohens v. Virginia,* 6 Wheat. 399, 5 L. Ed. 257).

To the contrary, this court is bound by the holding of the *en banc* Court of Appeals in *Shoup*. The *Shoup* Court upheld the enforceability of a provision of an incorporated agreement which mandated that upon a change in circumstances "the parties *shall* follow the child support guidelines contained in § 20-108.2 ..." and that upon notice that childcare costs had declined, "the Husband ... shall *reduce* his payment of childcare costs...." *Id.* at 244-45, n. 1, 556 S.E.2d 785-86, n. 1 (emphasis added). Here, paragraph 5(c) of the

Kaminsky's PSA established that, upon emancipation of one of their children "reductions in child support *shall occur immediately* and shall follow the guidelines ... [in] Virginia Code § 20-108.2." (emphasis added). The language of this provision is virtually indistinguishable from the language contained in the provisions which the *Shoup* Court held were enforceable. Nor does this provision violate any of the limitations articulated by the *en banc* Court in *Shoup*. It is not contrary to the best interests of the children;[2] it does not attempt to prevent this court from exercising jurisdiction over matters relating to the children; and it does not seek to terminate either party's duty to support their minor children. *See Shoup*, at 250-51, 556 S.E.2d 788. Indeed, as the Court of Appeals articulated in *Shoup*, important public policies support enforcement of this provision as well as others akin to it contained in agreements drafted by skilled domestic relations practitioners in the decades leading up to the decisions in *Shoup* and *Riggins*. As the Court of Appeals aptly stated in *Shoup*:

> A rule requiring parents to return to court for approval of a renegotiated amount of child support, as provided in an agreement that has been affirmed, ratified, and incorporated into an earlier decree, would undermine the Commonwealth's policy in favor of prompt resolution of disputes concerning the maintenance and care of children upon divorce. [T]he resources of both the court and the parties would be wasted by requiring a trial judge to *sua sponte* require parties to litigate a settled matter.

*Id*. at 253, 556 S.E.2d at 789. Years of experience at the bar and on the bench convince this judge that the limited resources of both litigants and the courts

---

[2] On July 1, 2000, Father was temporarily employed in a service business earning substantially less than he was earning during his employment with SCI. At oral argument, counsel for Father stipulated that his client was not asking the court to utilize this reduced income figure in calculating the support payable as of July 1, 2000. Father contends that the parties had agreed to re-set the support at $500.00 per month, effective that date, but stipulated that the court could utilize a somewhat higher figure if the court determined that no such agreement was proven and that income should be imputed to him at a level consistent with his earnings at SCI. The court finds that Father has not proven by the greater weight of the evidence that such an agreement between the parties was reached. As a result of Father's stipulation, this court need not decide whether it would enforce the incorporated terms of the PSA, if it were required to utilize deflated income figures for Father arising from voluntary under-employment.

would indeed be unnecessarily taxed by requiring parties "to litigate a settled matter." *Moreno v. Moreno*, 24 Va. App. 227, 233, 481 S.E.2d 482, 485-86 (1997). Hence, this court finds that both the holding in *Shoup* and the strong public policies underlying it dictate that the court give full effect to paragraph 5(c) of the Kaminsky's incorporated PSA.

(B) *The Paragraph 5(b) Issue*

Father also contends that the Court should further reduce his child support obligation effective January of each year, commencing January 1999, pursuant to paragraph 5(b) of the PSA. That provision reads in pertinent part as follows:

> In January of each year, beginning in 1998, the Parties agree that they shall exchange gross income data including, but not limited to, all W-2 forms received by the Parties, in order to adjust the child support payments for the forthcoming year so that said payments remain in conformity with Virginia Code Section 20-108.2. The Parties agree that they will not include either party's employer contributions to pension plans as a source of income in the child support calculations.

Father contends the stipulated evidence presented at the hearing established the respective incomes of the parties as of January 1 of each relevant year and, as a result, the court should now adjust the court-ordered support payments pursuant to the *en banc* decision in *Shoup*. This court disagrees.

The pertinent language utilized by the parties in paragraph 5(b) stands in stark contrast to the self-executing language used by the parties in *Shoup* as well as the language set out by the Kaminskys themselves in paragraph 5(c) of their PSA. In *Shoup*, the court order incorporating the agreement directed that upon any change in circumstances "the parties *shall* follow the child support guidelines...." Further, upon notification that the childcare costs had declined, "the wife shall notify the husband *who shall* reduce his payment of childcare costs ... the next month by his proportionate share...." (emphasis added). Moreover, in this case, pursuant to paragraph 5(c) of the Kaminsky's incorporated PSA, the court ordered that "upon each event of emancipation of the parties' children, reductions in child support *shall occur immediately* and *shall follow the guidelines*...." (Emphasis added.) Manifestly, this self-executing provision of the Kaminsky's divorce decree would necessarily effect a change in the support level upon the occurrence of the delineated event that constituted a change in circumstances. To the contrary, paragraph 5(b) of the

Kaminsky's PSA contains no such self-executing provision. Although this provision may evidence the parties' intention at the time of their execution of the PSA to recalculate the child support figure on a yearly basis, the decretal provision merely orders the parties to exchange financial information to accomplish that purpose and does not order that any appropriate modifications to the support figure actually take effect upon any specific occurrence or at a delineated time. As such, this provision does not fall within the ambit of the holding in *Shoup* and any support modification granted by the court at this time arising from the terms of paragraph 5(b) would constitute a retroactive modification of support in contravention of Va. Code § 20-112 and the holdings of Virginia's appellate courts in *Cofer v. Cofer* and its progeny. Accordingly, this court denies Father's request for further modifications of the court-ordered support as a result of the terms of paragraph 5(c) of the PSA.

### III. *The Prospective Modification of Support Issue*

The parties have also filed cross-motions for prospective modification of child support. Mother has filed a prophylactic motion for an increase in support to counteract any retroactive reduction the court may have decided to grant Father below a support level determined by utilization of Father's income at the time of his resignation from SCI. As the court has not granted a reduction to that extent, Mother's motion is moot. Father seeks a prospective reduction in support arguing that (1) his income level has decreased since the entry of the divorce decree due to no fault of his own; and (2) even if it were proper to impute income to him based upon his job change in 2000, it is no longer appropriate to do so because of his good faith efforts to secure employment at a similar income level over the ensuing two years. Mother responds that as Father voluntarily resigned from his prior employment at SCI, the Supreme Court's decision in *Antonelli v. Antonelli*, 242 Va. 152, 409 S.E.2d 117 (1991), necessarily mandates denial of the motion.

The Supreme Court's analysis in *Antonelli* was premised, in large part, on its decision five years before in *Edwards v. Lowry*, 232 Va. 110, 348 S.E.2d 259 (1986). In *Edwards*, the Court opined that a father who seeks a reduction in court-ordered support bears the burden of establishing that his inability to pay the support "is not due to his voluntary act or neglect." *Id.* at 112-13, 348 S.E.2d at 261. In *Edwards*, the father had been fired for stealing from his employer but the trial court still granted him a reduction in his support obligation. The Supreme Court reversed concluding that the father's reduction in income was "the direct consequence of his voluntary wrongful act." *Id.* at 113, 348 S.E.2d at 261. In a footnote, however, the Court noted that it was not

then deciding whether a payor parent, who voluntarily reduced his or her income for employment related reasons that could ultimately benefit the payee parent, might be entitled to a support reduction. *Id.* at 113, n. *, 348 S.E.2d at 261, n. *.

The facts in *Antonelli* presented the situation envisioned in the *Edwards* footnote. The payor father of four children voluntarily left a salaried management position with a stockbroker for a commissioned sales position with another stockbroker. When the stock market later experienced a substantial downturn, the father's income suffered a significant reduction. He petitioned for a reduction in his child support obligation and was initially granted relief in the Juvenile and Domestic Relations District Court; however, on appeal, the Circuit Court disagreed, finding that the decision to change jobs was "a voluntary act and a lateral move with similar income potential." *Id.* at 152, 409 S.E. at 118. The chancellor found that the father had "accepted the risk involved in being a commissioned stockbroker," and denied his petition for reduction. *Id.* On appeal to the Court of Appeals, the Court addressed the Supreme Court's "voluntary act or neglect" standard articulated in *Edwards* and defined the term "voluntary act" as a "willful act done for the purpose of frustrating the feasibility or enforceability of the support obligation." *Antonelli v. Antonelli*, 11 Va. App. 89, 94, 396 S.E.2d 698, 701 (1990). In its opinion, the Court of Appeals established the following standard to be applied in analyzing support reduction motions where a payor parent effects a good-faith change in employment which leads to a reduction in income.

> [A parent] who shows a reduced ability to satisfy his obligation, which is not due to his wrongdoing, his neglect of his affairs, or his intentional diminution of his financial ability other than in connection with a bona fide and reasonable business undertaking, is entitled to have that reduction considered along with the other usual factors, including his general earning capability, in determining his child support obligation.

*Id.* Based upon this standard, the Court of Appeals remanded the case to the Circuit Court for a determination of whether father's employment change was "a bona fide and reasonable business undertaking or whether it was for the purpose of reducing his ability to support his children." *Id.* at 95, 396 S.E.2d at 701.

On appeal from the Court of Appeals, the Supreme Court reversed. However, contrary to Mother's argument here, it did not reject the standard established by the Court of Appeals for analyzing support reduction motions

occasioned by voluntary job change decisions. Indeed, the Supreme Court expressly "agree[d] with the gloss the Court of Appeals had placed on *Edwards.*" *Antonelli*, 242 Va. at 155, 409 S.E.2d at 119. Instead, it found fault in the Court of Appeals' application of that standard to the facts presented in *Antonelli*. The Supreme Court held that when a payor parent effects a lateral "move" with nearly similar "income potential," a trial court does not impose an erroneous standard of proof when it finds that "the risk of his success at his new job was on the father and not upon the children." *Id.* at 156, 409 S.E.2d at 121.

The Court of Appeals revisited the *Antonelli* standard in *Mansfield v. Taylor*, 24 Va. App. 109, 408 S.E.2d 752 (1997). In *Mansfield*, the father was involuntarily terminated from a long-term position as a result of a reduction in force in 1992. Shortly thereafter, he obtained suitable substitute employment. However, in July 1993, he and his new wife began formulating plans for the creation of a new sole proprietorship and, by January 1994, the father had tendered his resignation to the new employer. At trial, the father testified that his efforts to start his own business were motivated in part by his supervisor's advice that he might need to look for a new job as layoffs, potentially including the father, might be necessitated by the downturn in the defense industry. Although his supervisor's testimony at trial differed from the father's as to the timing of the warning, it established that had the father not resigned, he would have been terminated within a period of three to eight weeks of the date of his resignation.

The trial court considered all of the evidence, including the father's motivation in changing his employment. Notwithstanding the father's testimony that his income would be dramatically reduced to a level below the minimum wage for a significant period of time while he attempted to get his new business off the ground, the trial court granted him a reduction in support based upon its reading of *Antonelli*. The Court of Appeals reversed, holding that the trial court had erred in considering only the father's motivation for the job change and not his knowledge of the practical effect his substantially reduced income would have on his children. *Mansfield*, 24 Va. App. at 114, 480 S.E.2d 755-56. The Court of Appeals opined that the Supreme Court's decision in *Antonelli* established a two-prong inquiry to be undertaken when considering the consequences of voluntary employment changes on court-ordered support obligations.

> The Supreme Court's analysis in *Antonelli* makes clear that actions which are *either* purposefully taken with the desire to evade one's support obligation *or* which evidence a careless disregard for one's

support obligations, can constitute "wrong doing" sufficient to warrant imputation of income.

*Mansfield* at 114, 480 S.E.2d 755 (emphasis in original).

Hence, in considering child support reduction motions arising from employment changes, the governing legal principles are clear. The ultimate burden of proof is on the party seeking a reduction in support to establish a change in circumstances that warrants a reduction in the court-ordered support. *Edwards*, 232 Va. at 112, 348 S.E.2d at 261; *Hammers v. Hammers*, 216 Va. 30, 31, 216 S.E.2d 20, 21 (1975). However, it is the party seeking imputation of income who has the burden to prove that the other parent was voluntarily foregoing more lucrative employment. *Albert v. Albert*, 38 Va. App. 284, 294, 563 S.E.2d 389, 412 (2002); *Niemic v. Department of Soc. Serv.*, 27 Va. App. 446, 451, 499 S.E.2d 576, 579 (1998). This burden may be satisfied by adducing evidence of a higher paying former job or by proving the current existence of a more lucrative employment opportunity, *Albert*, at 395, 563 S.E.2d at 412; *Brody v. Brody*, 16 Va. App. 647, 651, 432 S.E.2d 20, 22 (1993), provided the evidence "enable[s] the trial judge reasonably to project what amount could be anticipated." *Hur v. Virginia Dept. of Social Services Div. of Child Support Enforcement ex rel. Klopp*, 13 Va. App. 54, 61, 409 S.E.2d 454, 459 (1991). Once evidence is presented that a parent voluntarily chose to leave a job without being discharged, the burden of production shifts to that parent to introduce evidence explaining why the job change was not "voluntary." *Brody*, at 650, 432 S.E.2d at 22. Thus, the parent must establish that neither "voluntary" unemployment or underemployment exists. *Antonelli*, 242 Va. at 154, 409 S.E.2d at 118. A reduction in income occurring from a "voluntary" decision does not require a reduction in the obligation to pay support even if the decision was made in good faith. *Stubblebine v. Stubblebine*, 22 Va. App. 703, 708, 473 S.E.2d 72, 74 (1996) (*en banc*). Ultimately, a job change will be considered "voluntary" under *Antonelli* if it was "*either* purposely taken with the desire to evade one's support obligation, *or* ... evidence[s] a careless *disregard* for one's support obligations...." *Mansfield v. Taylor*, 24 Va. App. 109, 114, 480 S.E.2d 752, 755 (1997) (emphasis added). It is within this analytically framework that the court must evaluate Father's decision to leave his job with SCI.

In February 2002, Father left his employment with SCI. He explained at the hearing that half of his team members at SCI had either voluntarily or involuntarily left the company when he tendered his resignation. In addition, the contract on which his team had been working was nearing its conclusion and any renewal was uncertain. Father claimed that he had started looking for

suitable replacement employment over one month before he resigned, without success. He testified that he started looking in the D.C. metropolitan area but as the date when he would have been forced to leave his residence approached, he started looking for employment in upstate New York. Coincidentally, his then fiancée lived in Rochester, New York. Father moved to Rochester without having secured employment in that area.

A few months after Father moved to Rochester, he received an e-mail from Fred Sudakow, his former supervisor at SCI, inquiring about Father's potentially returning to SCI at a salary in excess of $65,000.00 per year. Father testified that he encouraged Sudakow to look into the uncertain situation for him, while Mother and the parties' daughter Natalie testified that they understood from Father that, in fact, he had obtained a firm offer from SCI he could have accepted at any time until February 2001. The parties agree that Father never became re-employed by SCI. The evidence also established that Sudakow continued to be employed by SCI through the date of the hearing.

Father asserts that he left SCI in absolute good faith based upon the uncertain status of his future employment with the company. Assuming, without deciding that the Father left SCI for the sole reason he claims, he concedes that he resigned without having obtained any replacement employment. In addition, he moved to Rochester, New York, the home of his fiancée, without any firm employment opportunities, leading to periods of seasonal employment, unemployment, and then employment at a salary less than one half of his last salary with SCI.

Even if this court were to find that Father had resigned his position with SCI without any intention to evade his child support obligation, Father's decision to leave SCI without having obtained new employment necessarily "evidence[d] a careless disregard for one's support obligation." *Mansfield* at 114, 480 S.E.2d 755, in contravention of the second prong of the *Mansfield* test. As such, an initial imputation of income at Father's last salary level at SCI would not only be factually warranted but also mandated by the decisions in *Mansfield* and *Antonelli*.

Further, the court rejects Father's position that income should no longer be imputed to him because he has tried in good faith to obtain suitable replacement employment since he left SCI, over two years ago. Father's decision to leave SCI was made with less justification than the father's resignation decision in either *Antonelli* or *Mansfield*. In *Antonelli*, the father changed companies because of his view of future income prospects. In *Mansfield*, the father resigned to establish his own business under industry circumstances similar to those claimed by Kaminsky. Here, Father left SCI

ostensibly because of concern that he *might* no longer be employed by the company in the near future. However, Father's actions in leaving SCI *assured* that he would be without suitable employment. Contrary to Father's position that his loss of employment with SCI was inevitable, the evidence establishes that his immediate supervisor not only did not lose his position in the ensuing months but remains employed at SCI to this date. A parent who voluntarily elects to leave employment without having made any arrangements for replacement income sufficient to meet the parent's support obligations neglects his or her financial and moral responsibilities to the parent's children. Under such circumstances, a parent should not be heard to complain that suitable replacement employment could not subsequently be found. As such, this court holds that income should continue to be imputed to Father at his salary level at the time he voluntarily resigned his position at SCI. Accordingly, Father's motion for a prospective reduction in child support is denied.

## IV. *Conclusion*

The parties have stipulated that the presumptive amount of child support payable pursuant to Va. Code § 20-108.2 was $286.00 per month effective July 1, 2000, and $259.00 per month as of the date of the hearing on the instant petitions. For the reasons set forth in this opinion letter, the court deviates from the presumptive level, pursuant to Va. Code § 20-108.1(B)(3) and orders that child support be calculated at the sum of $547.00 per month effective July 1, 2000.[3] The total arrearages, including interest, should now be calculated through November 30, 2002.

---

[3] The parties stipulated this to be the appropriate sum if the court imputed income to Father at his last SCI earnings level.